UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| S.K. SERVICES and STEVE HOGUE, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 1:08-CV-158 |
| v. | ) | |
| | ) | Chief Judge Curtis L. Collier |
| FEDEX GROUND PACKAGE SYSTEM, INC., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

Before the Court is Defendant FedEx Ground Package System, Inc.'s ("Defendant") motion for summary judgment (Court File No. 47) and supporting memorandum (Court File No. 48). Plaintiffs S.K. Services and Steve Hogue (Plaintiffs") filed a response (Court File No. 52) and Defendant filed a reply (Court File No. 54). Each filing also bears supporting exhibits. After carefully considering these materials, for the following reasons, the Court will **GRANT IN PART** and **DENY IN PART** Defendant's motion for summary judgment.

## I.     RELEVANT FACTS AND PROCEDURAL HISTORY

Steve Hogue is the sole proprietor of S.K. Services ("SK"), a janitorial services company. Beginning in 2002, Plaintiffs contracted with Defendant to provide janitorial services to Defendant's facility at 2217 Polymer Drive in Chattanooga, Tennessee. (Compl. (Court File No. 1 Ex. 1) ¶ 6.) The parties operated under a written agreement they reached in 2002 ("2002 Agreement"), with periodic verbal renewals, until reaching a new written agreement in June 2007. (Hogue Dep. 15.) This "Janitorial Services Agreement" (id. Ex. 2) became effective June 20, 2007, and incorporated by reference a "Specification Contract" indicating the parties' agreement was a term contract to run

for one year (*id.* Ex. 3), with Plaintiffs to invoice Defendant monthly for payments of $4,802.63 (together the "2007 Agreement"). The Janitorial Services Agreement also contained a provision stating "[n]o waiver, alteration or modification of any of the provisions of this Agreement will be binding upon either party unless set forth in a writing signed by both parties." (*Id.* Ex. 2 § 10.3.)

Approximately one month before entering the 2007 Agreement, the parties had entered two separate "Standard Convenience Purchase Agreements." The first became effective May 22, 2007, and stated Plaintiffs would provide yard maintenance, grass cutting, weed control, and trash and debris removal services in exchange for a $242.00 weekly payment, for which Plaintiffs would invoice Defendant on a monthly basis. (*Id.* Ex. 6.) The second became effective June 1, 2007, and provided Plaintiffs would "[p]erform emergency water extraction from flooded basement due to heavy rainstorm. Also sanitize and clean carpets and dehumidify area." In exchange, Plaintiffs would receive a $155.00 weekly payment, also to be invoiced monthly. (*Id.* Ex. 5.)

Hogue alleges that prior to the execution of these contracts in 2007, Plaintiffs became aware Defendant would open a new facility. He further alleges he received assurances from John Certo, Defendant's Maintenance Manager, and Tom Kramer, Defendant's General Manager, that Plaintiffs would receive the contract for the new facility and provide services to the existing facility on Polymer Drive until Defendant moved. (Hogue Aff. ¶ 7.) Hogue asserts he recorded this conversation in a "Ledger Note" which stated Kramer asked Hogue "to do the new building" and if "he would continue to do the old building while in operation." Hogue also wrote that "[t]he meeting ended with a verbal agreement with Steve Hogue and Tom Kramer sealing the new contract for 2008/2009 year." (Hogue Dep. Ex. 20.)

During 2007, Plaintiffs employed Tommy Blake, an African-American man, to perform

janitorial services at Defendant's facility. In December 2007, Defendant concluded Blake had stolen payroll checks from its facility. (Hogue Aff. ¶ 11.) Hogue maintains he conducted an investigation into this accusation, spoke with several sources including Blake, and concluded Blake did not steal the checks. (*Id.* ¶¶ 11–15.) Defendant's investigation apparently warranted a different conclusion, for in January 2008, Defendant informed SK that Blake was no longer allowed on Defendant's premises. Because Hogue had no other work for Blake to perform, he maintains he had to discharge Blake. (*Id.* ¶ 19.) Hogue complained to both Kramer and a FedEx supervisor in Atlanta about Defendant's decision to bar Blake from the grounds, and opined that Blake's exclusion was due, at least in part, to racial animus on the part of Defendant's employees at the Chattanooga facility. (*Id.* ¶¶ 20–21.) Hogue based this latter conclusion on allegedly race-based conduct he says Certo initiated while Blake was working at the facility, including Certo's allegedly calling Blake a "black motherf--king n----r" frequently and using "n----r" in other contexts (Blake Dep. 35, 46–47; Hogue Dep. 162–63), calling him a "monkey" (Hogue Dep. 158–59), spying on Blake in the workplace (Russell Dep. 18; Blake Dep. 34), excluding him from restrooms (Hogue Dep. 161), and stating that the social security and welfare systems were "made for the black man" (*id.*).

Hogue alleges that as a result of his complaining about Blake's treatment, he became subject to harassing treatment by Kramer, Defendant's General Manager, and that ultimately he did not receive the 2008 contract for the existing facility or the new facility. (Hogue Dep. 221–22.) Specifically, Hogue alleges Defendant began to pay his monthly invoices late (Hogue Dep. 262–63), removed Plaintiffs' names from a list of service providers on the wall of the facility (*id.* at 192), and suddenly began to complain to Hogue about the quality of his work, even though Hogue had never received previous complaints about the quality of his work and at least one of Defendant's

employees testified he did a "fantastic job" (Bell Dep. 36–37, 41–42; Hogue Aff. ¶ 3). Defendant, for its part, maintains it chose another provider, ServiceMax, for the 2008 contract because ServiceMax's bid was four times lower than SK's for comparable services. (Robinson Dep. 15–23; Hogue Dep. 197.) On May 23, 2008, Defendant informed Hogue it would not renew the contract with SK, such that Plaintiffs would not provide services at the existing facility after June 20, 2008.

On June 20, 2008, his last day at Defendant's facility, Hogue submitted nine invoices for services which, he maintains, he rendered to Defendant during his course of working at its facility and which were not covered by any other contract (the "June 20 invoices"). The invoices are numbered 514 through 522 consecutively, and each invoice bears the statements "charges for services render [sic] during the contract term October 2002 thru June 20, 2008" and "charges to be billed at the entirety of contract per John Certo." (Hogue Dep. Ex. 11–19.) The invoices state Hogue's charges for different services, including painting various areas of Defendant's facility, "additional use of floor machine," "cleaning of bay doors", "performing emergency water extration [sic] from flooded basement area, sanitizing and dehumidifing [sic] carpets areas," and "misc. charges." (*Id.*)

Plaintiffs filed suit in the Chancery Court of Hamilton County, Tennessee, stating causes of action for breach of contract; breach of duty of good faith and fair dealing; violation of 42 U.S.C. § 1981; violation of the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-301(2) ("THRA"); and outrageous conduct and intentional infliction of emotional distress. (Compl. ¶¶ 17–21.) On July 11, 2008, Defendant removed the action to this Court based on federal question jurisdiction, 28 U.S.C. § 1331, stemming from Plaintiffs' § 1981 claim. (Court File No. 1.) On August 29, 2008, the Court dismissed Plaintiffs' claim for violation of the duty of good faith and fair dealing. (Court

4

File No. 11.)  Plaintiffs amended their complaint on October 23, 2008, to include a claim that Defendant failed to pay them monies due for services rendered (Court File No. 32), which the Court interprets as a claim for unjust enrichment relating to the June 20 invoices.  By memorandum and order of December 11, 2008, the Court granted Defendant's motion for partial judgment on the pleadings with respect to Plaintiffs' claims for breach of contract relating to the new facility and outrageous conduct and intentional infliction of emotional distress, but preserved Plaintiffs' claim for breach of contract relating to the old facility.  (Court File Nos. 34, 35.)  Defendant now moves for summary judgment on Plaintiffs' claims for breach of contract, unjust enrichment, and retaliation under § 1981 and the THRA.

## II.      STANDARD OF REVIEW

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Initially, the burden rests on the movant to conclusively show no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003).  The Court must view the evidence, including all reasonable inferences, in the light most favorable to the non-movant.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).  It is the Court's duty to determine if the non-movant has presented sufficient evidence to raise issues of fact; however, the Court does not weigh evidence, judge the credibility of witnesses, or determine the truth of the matter.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Weaver v. Shadoan*,

5

340 F.3d 398, 405 (6th Cir. 2003).

At the same time, the purpose of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fed. R. Civ. P. 56 (advis. comm. notes) (1963). The movant must demonstrate the absence of a genuine issue of material fact, but the non-movant is not entitled to a trial solely on the basis of its allegations. The non-movant must submit significant probative evidence to support its claim. *Celotex*, 477 U.S. at 324. A scintilla of evidence is not enough; the non-movant must present evidence sufficient for a jury to reasonably find for its side. *Liberty Lobby*, 477 U.S. at 252; *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). The movant is entitled to summary judgment if the non-movant fails to make a satisfactory showing on an essential element of its case for which it bears the burden of proof. *Celotex*, 477 U.S. at 323. It is the Court's role to decide if a fair-minded jury could return a verdict for the non-moving party, or if "the evidence . . . is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251–52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## III.     DISCUSSION

Because the Court's analysis of Plaintiffs' breach of contract claim affects its analysis of the retaliation claim, the Court first examines the breach of contract claim, turns next to Plaintiffs' claim for unjust enrichment, and concludes by analyzing Plaintiffs' claims for retaliation under § 1981 and the THRA.

### A.     Breach of Contract

In moving for summary judgment, Defendant argues Plaintiffs cannot support a breach of

6

contract claim because Plaintiffs have not shown clear and convincing evidence establishing an oral modification of the 2007 Agreement, and even if they had, such a modification lacked the necessary consideration. Plaintiffs respond that the 2007 Agreement did not prohibit verbal negotiations, the parties waived by their conduct any provision mandating modifications be in writing, and they supplied adequate consideration supporting a modification.[1]

The parties agree the written contracts, as well as any putative modification, should be construed under Pennsylvania law. Relying on *Penn Mutual Life Insurance Co. v. Bank of New England Corp.*, 756 F. Supp. 856, 858–59 (E.D. Pa. 1991), and cases cited therein, Defendant correctly observes Pennsylvania courts have used three tests for establishing an oral modification in the face of a clause prohibiting such modifications or limiting the contract to written modifications. First, courts in the Keystone State have required that "where the writing contains an express provision that it constituted the entire contract between the parties and should not be modified except in writing, the party seeking to show subsequent oral modification in the agreement must prove it by clear, precise, and convincing evidence." *Nicolella v. Palmer*, 248 A.2d 20, 23 (Pa. 1968). Alternatively, courts may waive the writing requirement for modifications "if its enforcement would result in something approaching fraud." *Universal Builders, Inc. v. Moon Motor Lodge, Inc.*, 244 A.2d 10, 16 (Pa. 1968). Finally, courts may use a two-step analysis to "check to see if there was any intent to waive the contract requirement that all modifications be in writing" and

---

[1]In its reply, Defendant also argues the putative oral modification violates the statute of frauds. Defendant did not raise this argument, however, in its opening memorandum supporting its motion for summary judgment. Because the statute of frauds issue may have been relevant to the oral modification issue, Defendant should have raised it in its opening brief, where Plaintiffs would have had a chance to respond to it. As Defendant did not do so, the Court will not consider the statute of frauds argument. *See Golden v. Comm'r*, 548 F.3d 487, 493 (6th Cir. 2008) (holding an argument is forfeited when not raised in the opening brief).

7

if there was, to "examine the conduct of the parties to see if there was a waiver of the performance required by the contract." *Penn Mut.*, 756 F. Supp. at 859 (citing *Douglas v. Benson*, 439 A.2d 779, 783 (Pa. 1982)). Defendant argues Plaintiffs meet none of these tests to overcome what Defendant characterizes as a no-oral-modifications clause in the 2007 Agreement.

The obstacle for Defendant here, however, is that there is a dispute over whether the parties mutually assented to prohibit oral modifications to the 2007 Agreement. The dispute centers on a line in the Specification Contract. The original, typed text of the line at issue appears to read, "Anything not addressed is open to verbal negotiation with S.K. Services" (Hogue Dep. Ex. 3), and indeed, counsel for both parties agree this is what the typewritten provision states (*id.* at 35). However, the typewritten provision appears to have a handwritten line drawn through it at a later date, and the handwritten words "STRIKE THIS," an unidentified person's signature, and a date appear to the right of the typewritten line. (*Id.* Ex. 3.) Throughout his deposition testimony, Hogue maintained he did not attempt to strike the written provision and did not know who did: "But, I mean, somebody took a pen and drawed through that. . . . I mean, I didn't know nothing about nothing being marked out. . . . I would assume [the writing stating "STRIKE THIS"] is John Certo's, but I'm not sure." (Hogue Dep. 36, 38, 40.) Hogue vehemently denied having prepared the Specification Contract itself, or any modifications to it:

> Q       When I asked you who prepared this document, you said FedEx Ground. Do you know any individual that typed this document?
> A       No, other than—like I said, I dealt with John Certo. Like I said, I wasn't there when it was typed. I just can tell you for certain that it was not done by my company or anybody in my company.
> Q       Why do you know that for certain?
> A       Because I know. I can tell, the ink, the language, nothing—everything. It's—this right here, I would never do nothing that—I mean, that right there looks awful. I mean, this is a fabricated sheet you gave me, I mean, if you're saying this is my company that did that.

8

(*Id.* at 39.)

The Pennsylvania Supreme Court has addressed a situation where a contract's claimant attempted to show a modification to a written agreement using pen and ink deletions to the typewritten text. *Carocci v. Piccone*, 63 A.2d 65 (Pa. 1949). In *Carocci*, which appears to remain good law, the court held a pen and ink deletion will not "take precedence over positive language in the typewritten text." *Id.* at 65. At most, such an attempted deletion would render the contract ambiguous, but would not result in the elimination of the provision at issue. *Id.*

The instant dispute closely resembles the situation the *Carocci* court addressed. One party in the instant case—it is unclear exactly who, presenting a factual dispute—attempted via handwriting to delete the Specification Contract line calling for verbal negotiation of anything not explicitly addressed by both parties. The Specification Contract, therefore, does not so much contain a provision that "explicitly" or "expressly excluded" verbal negotiation, as Defendant characterizes it (Court File No. 48, at 3), but rather, a handwritten line striking through a typewritten provision that expressly *contemplated* verbal negotiation. Including such a provision was consistent with the parties' past course of conduct—their repeated verbal renewals of the 2002 Agreement until they entered the separate, written 2007 Agreement. This Court, accordingly, will not grant the attempted strike through interpretive precedence over what was typed on the Specification Contract, particularly where Hogue disavows any intent on his part to eliminate the verbal negotiation provision. *See Matevish v. Ramey Borough Sch. Dist.*, 74 A.2d 797, 800 (Pa. Super. Ct. 1950) ("To modify a contract requires a new meeting of minds . . . . Terms or stipulations inserted or altered in a contract by officers of a school district, differing from those contained in the resolution of the board authorizing the contract, do not bind the district.").

9

It is true, as Defendant points out, that Janitorial Services Agreement § 10.3, incorporated into the 2007 Agreement, appears to provide only for written modifications: "No waiver, alteration or modification of any of the provisions of this Agreement will be binding upon either party unless set forth in a writing signed by both parties." Further, Janitorial Services Agreement § 10, entitled "Miscellaneous," provides: "Amendments to this Agreement must be in a writing signed by the parties." Defendant argues this text conflicts with the line in the Specification Contract—also incorporated into the 2007 Agreement, and which Hogue denies was ever intended to be eliminated—providing "anything not addressed" would be open to verbal negotiation. But examining the two documents more closely, there is no conflict. The Janitorial Services Agreement provides it will run for one year—from June 20, 2007, to June 20, 2008—but says nothing about how the Agreement is to be renewed. The Agreement's limitation that modifications be in writing concerns the definition of a modification at common law: a change in one or more of the contract's material terms affecting the parties' obligations to each other. *See, e.g.*, *Reliance Ins. Co. v. Penn Paving, Inc.*, 734 A.2d 833, 838 (Pa. 1999) ("A material modification in the creditor-debtor relationship consists of a significant change in the principal debtor's obligation to the creditor that in essence substitutes an agreement substantially different from the original agreement . . . ."). In contrast, a renewal recreates a legal relationship while preserving the material terms of the parties' old agreement. *See Aaron v. Woodcock*, 128 A. 665, 666 (Pa. 1925) ("To renew a lease implies not only a leasing again of the premises, but more, in that it conveys the definite idea that all the terms of the new lease, including the period during which it is to run, are to be the same as those contained in the original lease; for, to 'renew' is to 'revive' or 'restore to existence' . . . ."); BLACK'S LAW DICTIONARY 1322 (8th ed. 2004) (a renewal is the "re-creation of a legal relationship or the

replacement of an old contract with a new contract, as opposed to the mere extension of a previous relationship or contract").

Here, the renewal alleged by Hogue would have extended the Agreement's ending date past June 20, 2008, but would have left undisturbed all other material terms of the Agreement. In other words, the putative extension recreated their previous legal relationship on all the same terms except the date. And, for reasons developed further below, a jury could find Plaintiffs and Defendant entered into a separate negotiating process for the extension, ultimately agreed on the same price as used in the 2007 Agreement, and extended the 2007 Agreement past its stated expiration.[2]

Based on Hogue's testimony, the Court concludes an issue of material fact exists concerning whether the parties intended, in the 2007 Agreement, to preserve the ability to make oral modifications or to eliminate that ability. Assuming the legal requirements for consideration were satisfied—an analysis to which the Court turns next—such a dispute would present an issue of credibility reserved for the finder of fact.

Under Pennsylvania common law, modifications to service contracts require consideration or reliance separate from that in the original contract; otherwise, the purported modification is

---

[2]Even if there were any ambiguity between the two provisions, the Court's conclusion in this regard is bolstered by the parties' course of dealing from 2002 to 2007. *See* RESTATEMENT (SECOND) OF CONTRACTS § 202 (1981); *see also Atl. Ref. Co. v. Wyo. Nat'l Bank*, 51 A.2d 719, 723 (Pa. 1947) (holding that if an ambiguity arises, the parties' intent is "not infrequently . . . best evidenced by the relevant conduct of the parties themselves pursuant to their common understanding of their respective contractual rights and liabilities"). After entering the 2002 Agreement, the parties orally renewed that Agreement from time to time until entering the written 2007 Agreement. Defendant has not introduced evidence showing the parties explicitly intended to end their practice of orally renewing their written agreements; for the reasons developed above, their reliance on the handwritten strike through of the verbal negotiation provision is unpersuasive. Equally unavailing, in this regard, is Defendant's reliance on the line in the "Statement of Work" stating "EXCLUDE Verbal Negotiation bullet point" (Hogue Dep. Ex. 2), as that purported exclusion relies on the invalid handwritten attempt to delete the verbal negotiation clause in the Specification Contract.

11

unenforceable. *Barnhart v. Dollar Rent A Car Sys., Inc.*, 595 F.2d 914, 919 (3d Cir. 1979) (citing *Nicolella*, 248 A.2d 20). Consideration does not exist when a party performs an act he was already under a legal obligation to render. *Pa. Gas & Water Co. v. Nenna & Frain, Inc.*, 467 A.2d 330, 335 (Pa. Super. Ct. 1983). Pennsylvania law defines consideration, among other definitions, as "a benefit to the party promising, or a loss or detriment to the party to whom the promise is made." *Gen. Mills, Inc. v. Snavely*, 199 A.2d 540, 543 (Pa. Super. Ct. 1964).

Here, Defendant maintains that even if Tom Kramer promised Hogue that Defendant would award Plaintiffs contracts for janitorial services after June 20, 2008 (and Defendant does not concede Kramer so promised), such promises lacked consideration because they did not specify the scope of duties or prices. Rather, Defendant argues, Plaintiffs would have continued providing services under the same terms, including price, for an indefinite period. Defendant maintains this is insufficient new consideration to support a modification. (Court File No. 48 at 4–5.) Plaintiffs respond by pointing to deposition testimony which, they contend, establishes that, in exchange for receiving an extension beyond June 20, 2008, Hogue agreed to keep his prices from the 2007 Agreement the same for the putative 2008 extension, despite having to contend with economy-wide rising costs and having to purchase additional worker's compensation insurance. (Hogue Dep. 150–51, 258–60.)

For example, Hogue testified that in a conversation with Certo, Certo said "well, since you're going to be doing the new contract and the old contract, that, you know, if you keep your price the same, you know, we will take care of all this, you know." (Hogue Dep. 124.) Hogue also asserts that a "Ledger Notes" letter he prepared on December 21, 2007, referred to "a meeting with Tom Kramer to discuss the opportunity to bid for the new facility opening in 2008." (Hogue Dep. 147.)

12

Hogue testified that in this meeting, Kramer "told me what I just told you just a minute ago, that he promised me the building and the facility, and we would discuss service duties and price after the first of the year. That's the exact words, and the old facility, that the old facility would stay at the original price." (*Id.*) The letter itself reads, in relevant part:

> Mr. Kramer stated that he wanted S.K. Services, Steve Hogue, to do the new building and also, ask if he would continue to do the old building while in operation.
>
> ...
>
> The meeting ended with a verbal agreement with Steve Hogue and Tom Kramer sealing the new contract for [the] 2008/2009 year.

(Hogue Dep. Ex. 20.) Hogue also testified that, at Defendant's request, he held off on submitting invoices for completed work based on Defendant's assurance that SK would continue providing services at the old facility even after the expiration of the written 2007 Agreement. (Hogue Aff. ¶ 10.)

As Defendant points out, some of the testimony Plaintiffs highlight goes to establishing consideration for the 2007 Agreement, but not for any subsequent modification. For example, in his deposition, Certo agreed that "Mr. Hogue would be charging [Defendant] the same rates for the calendar year 2007/2008 that he had charged for 2005/2006." (Certo Dep. 45–46.) While this could be read as establishing consideration for establishing the 2007 Agreement, it says nothing about any consideration for the putative modification. Other evidence, however, such as that described in the preceding paragraph, does point to what could be described as consideration for an extension of services going forward in 2008. Consider also, for instance, Hogue's testimony that one of Defendant's managers from its headquarters outside Pittsburgh asked Hogue to keep his price down as an incentive to secure the contract for the new facility. (Hogue Dep. 150.) The manager

13

allegedly said to Hogue, "if you just keep your price down there one year, when we get in the new building, the budget will be bigger and we'll be able to pay you more." (*Id.* at 150–51.) Drawing reasonable inferences from this testimony in Plaintiffs' favor, Hogue's promise to keep his prices the same was not an extension of his promise to perform under the same conditions as the 2007 Agreement because circumstances had changed and Hogue faced increased costs when he bargained for performance in 2008. Instead, a plausible view is that both Hogue and Defendant intended Hogue's promise to keep prices the same to be the inducement for Hogue to receive a verbal extension to the 2007 Agreement covering the period after June 20, 2008.

In the Court's view, the testimony proffered by Hogue, when read in the light most favorable to Plaintiffs (as the Court must do), could persuade a rational finder of fact that negotiations between him and Defendant covered Hogue's agreeing to keep his prices the same in exchange for his provision of services to both facilities in 2008. Though the Court dismissed Hogue's claim vis-à-vis the new facility in its previous Order (Court File No. 35), a jury could still find, after weighing the conflicting evidence, that Plaintiffs and Defendant exchanged promises for servicing the old facility in 2008 that were separate from the consideration undergirding the 2007 Agreement, in which Plaintiffs incurred a detriment (keeping his prices the same despite business reasons for increasing them) in exchange for the benefit of an extension. Defendant's argument that there was no new consideration for an extension because the price stayed the same is unavailing; the requirement that new consideration be supplied to support a modification does not require separate price figures, but only that there was a separate process of negotiation taking into account any material changed circumstances between the parties.

Because the foregoing analysis demonstrates a genuine issue of material fact on Plaintiffs'

14

breach of contract claim, summary judgment is inappropriate and the Court will **DENY** Defendant's motion on this claim.

### B. Unjust Enrichment

Defendant contends Plaintiffs cannot support an unjust enrichment claim because some of the June 20 invoices are invalid, an enforceable contract covered the services for which Hogue submitted the invoices, and Plaintiffs provide inadequate evidence of the value of services rendered in the invoices. Plaintiffs' response consists mainly of going through each contested invoice seriatim and asserting that each one represents services rendered for which Defendant owes Plaintiffs. (Court File No. 52, at 20–25.)

Because unjust enrichment is a quasi-contractual, equitable remedy, it is axiomatic that an unjust enrichment claim can only arise when no contract exists between parties or an existing contract became unenforceable or invalid. *Whitehaven Cmty. Baptist Church v. Holloway*, 973 S.W.2d 592, 596 (Tenn. 1998). Additionally, a plaintiff must show "the defendant will be unjustly enriched absent a quasi-contractual obligation," *id.*, and that the plaintiff has "exhausted his remedies against the person with whom he had contracted, and still has not received the reasonable value of his services," *id.* (quoting *Paschall's, Inc. v. Dozier*, 407 S.W.2d 150, 155 (Tenn. 1966)).

Here, Defendant's first argument is that Hogue admits that, since the 2002 Agreement, SK's contract with Defendant "was for general upkeep of the building." (Hogue Dep. 217.) Hogue elaborated that the 2002 Agreement contained his obligation for "[b]asically general cleaning, the lawn service, the landscaping—not the landscaping, the lawn service and picking up the yard, keeping the yards clean, stuff like that." (*Id.*) The parties have not supplied the Court a copy of the 2002 Agreement; however, Plaintiffs offer no evidence to counter Defendant's argument that all of

the June 20 invoices fell within the scope of the contract for "general upkeep of the building," or within the language of the Standard Convenience Purchase Agreements. Additionally, Defendant introduced evidence that it was Plaintiffs' custom to "always bill everything 30 days after it's been done" (*id.* at 47), not to submit invoices at the expiration of the agreement. On summary judgment, once the moving party has demonstrated the absence of an issue of material fact, the non-moving party introduce more than a scintilla of evidence to contest it. *Liberty Lobby*, 477 U.S. at 252. Based on this uncontested argument, it appears to the Court that the services stated on the invoices—painting various areas of the facility, floor cleaning, and water extraction—fell within the definition of general upkeep. Thus, a valid, enforceable contract governed the provision of these services, and Plaintiffs cannot raise an unjust enrichment claim to try to recover their value.

Accordingly, the Court will **GRANT** summary judgment on Plaintiffs' unjust enrichment claim.

### C.     Retaliation under § 1981

Defendant argues Plaintiffs cannot prove retaliation because Hogue does not meet the prima facie requirements for a § 1981 retaliation claim, and even if he did, he cannot prove Defendant's reason for reaching an agreement with ServiceMax was pretextual. Plaintiffs respond the evidence establishes both a prima facie case of retaliation and pretext on Defendant's part.

As part of the Civil Rights Act of 1866, Congress provided that

[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a). Over a century later, in the Civil Rights Act of 1991, Congress clarified that

"the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* § 1981(b).

Plaintiffs' retaliation claim implicates a relatively novel issue: the scope of § 1981's application to retaliation claims stemming not from an employer-employee relationship, but instead from a non-employment contractual relationship.[3]  Both parties have cited to one case addressing such a relationship, *Benton v. Cousins Props., Inc.*, 230 F. Supp. 2d 1351 (N.D. Ga. 2002), but appear to be unable to locate any other cases addressing § 1981 in this context.[4]  The Court notes, though, that *Benton* cited an appellate case, *Webster v. Fulton County*, 283 F.3d 1254 (11th Cir. 2002), which held an independent contractor may state a § 1981 claim for refusing to award a contract in retaliation for the contractor's lawsuit alleging race discrimination.  *Webster*, 283 F.3d at 1257.  The *Webster* court reasoned that

> [d]isappointed bidders are at the core of Section 1981's protection: Section 1981 is a protection against an entity . . . declining to make a contract with a party . . . on account of race.  Thus, once we say that Section 1981's protection extends to prohibiting retaliation against a party who has filed a formal complaint charging racial discrimination . . . it follows that having no contract (that is, being a disappointed bidder) is no bar, but actually an element of a traditional section 1981 retaliation claim alleging failure to contract.

*Id.* (footnote omitted).  The Court finds *Webster*'s holding relevant for the instant case, as it affirms

---

[3]Indeed, Janitorial Services Agreement § 6 specifies that SK "will perform all services as an independent contractor.  Nothing in this Agreement will create an employer-employee or principal-agent relationship between [Defendant] and [SK]."  (Hogue Dep. Ex. 2.)

[4]The *Benton* court observed that "[i]f there are few Section 1981 cases claiming harassment in connection with an [sic] non-employment contractual relationship, there are even fewer cases dealing with the question of retaliation outside the employment context, under Section 1981."  230 F. Supp. 2d at 1381.

§ 1981's use in the context of the horizontal relationship between two contracting parties of equal bargaining power, rather than the vertical relationship between a supervising employer and the supervised employee. Although *Webster* did not directly address retaliation based on a contracting party's complaint on behalf of his employee, the animating concern behind § 1981 announced by the *Webster* court remains the same in this case.

As a threshold matter, Defendant argues the Court should not even reach Plaintiffs' retaliation claim because no contract existed governing Plaintiffs' relationship with Defendant past the expiration of the 2007 Agreement. The Court notes the authority is unclear regarding whether the existence of a contract is a prerequisite to maintaining a § 1981 claim. *Benton* assumed it was, and the absence of a contract led that court to grant summary judgment as to one of the defendants. *See Benton*, 230 F. Supp. 2d at 1371 ("Before examining whether the defendants bore a discriminatory intent, the plaintiff must first produce evidence demonstrating that the defendants acted to deprive her of benefits to which she was entitled under her contract . . . ."); *id.* at 1374 ("[S]ince no contract existed between [defendant] and plaintiff . . . it would appear that [defendant] is entitled to summary judgment on plaintiff's Section 1981 claims . . . ."). On the other hand, the plain language of the statute provides that "make and enforce contracts" includes the "making" of contracts, 42 U.S.C. § 1981(b), which could extend to the negotiations involved in attempting to enter a contract, regardless of whether a contract ultimately results. *See Runyon v. McCrary*, 427 U.S. 160, 170–71 (1976) ("[A] Negro's [§ 1981] right to 'make and enforce contracts' is violated if a private offeror refuses to extend to a Negro, solely because he is a Negro, the same opportunity to enter into contracts as he extends to white offerees."); *Black Educ. Network, Inc. v. AT&T Broadband, LLC*, 154 F. App'x 33, 39 (10th Cir. 2005) ("Section 1981 has been held to 'prohibit[],

18

when based on race, the refusal to enter into a contract with someone . . . .'") (quoting *Patterson v. McLean Credit Union*, 491 U.S. 164, 176–77 (1989)); *but see Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 477 (2006) ("[W]hile Congress revised *Patterson*'s exclusion of postformation conduct, it let stand *Patterson*'s focus upon contract obligations. In fact, it positively reinforced that element by including in the new § 1981(b) reference to a '*contractual relationship*.'"). The Court need not attempt to resolve these conflicting authorities, however, because for purposes of summary judgment, the Court held above that a reasonable jury could find the parties orally agreed to extend the 2007 Agreement past June 20, 2008.

The parties agree the Court should use the *McDonnell Douglas/Burdine* framework to evaluate the retaliation claim at summary judgment. This comports with precedent from the United States Court of Appeals for the Sixth Circuit. *See Newman v. Fed. Express Corp.*, 266 F.3d 401, 406 (6th Cir. 2001) ("Section 1981 claims are analyzed under the Title VII *McDonnell Douglas/Burdine* framework."). *Benton* also employed the *McDonnell Douglas/Burdine* framework. 230 F. Supp. 2d at 1369. Under this framework, a plaintiff must first establish a prima facie case of retaliation, creating a rebuttable presumption that retaliation occurred. The burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its action. If the defendant satisfies this burden, the plaintiff must then prove the defendant's proffered reason was pretextual. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 461 (6th Cir. 2001).

### a.    Prima Facie Case

The Sixth Circuit has not considered the requirements for a plaintiff's prima facie case in § 1981 retaliation claims outside an employer-employee relationship, but both parties cite to a Second

Circuit case that has:

> To establish retaliation, plaintiffs must show that plaintiffs were (1) engaged in an activity protected under anti-discrimination statutes, (2) the defendants were aware of plaintiffs' participation in the protected activity, (3) the defendants took adverse action against plaintiffs based upon their activity, and (4) a causal connection existed between plaintiffs' protected activity and the adverse action taken by defendants.

*Lizardo v. Denny's, Inc.*, 270 F.3d 94, 105 (2d Cir. 2001). The parties here dispute whether Hogue engaged in a protected activity when he complained about Blake's treatment by Defendant, and whether Plaintiffs have demonstrated a causal connection between Hogue's complaint and Defendant's failure to extend him a contract for the new facility.

### i. Protected Activity

Under Title VII, a plaintiff "must demonstrate that her opposition was reasonable and based on a good-faith belief that the employer was acting in violation of Title VII. . . . An employee has engaged in opposing activity when she complains about unlawful practices to a manager, the union, or other employees." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 516 (6th Cir. 2009) (citing *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579–80 (6th Cir. 2000)). "Individuals are . . . protected under Title VII from discrimination because of their advocacy on behalf of protected class members." *Id.* at 513 (citing *Johnson*, 215 F.3d at 575). "Section 1981 also prohibits discrimination based on association with or advocacy for non-whites, and we review § 1981 claims under the same standard as Title VII claims." *Id.* at 512 (citing *Johnson*, 215 F.3d at 573 n.5, 574–75).

Though *Barrett* addressed the firing of an employee who spoke out on behalf of her coworkers, not a contractor who spoke out on behalf of his employee as in the instant case, the Court finds the extension of *Barrett*'s protected activity standard to Plaintiffs' § 1981 claim to be appropriate and supported by other precedents. For example, the Sixth Circuit has held a plaintiff

20

had standing to sue under § 1981 because even though he "was not fired because of his race, it was a racial situation in which he became involved that resulted in his discharge from his employment." The "situation" the Sixth Circuit described was the plaintiff's protesting the alleged discriminatory firing of a black coworker. *Winston v. Lear-Siegler, Inc.*, 558 F.2d 1266, 1268 (6th Cir. 1977). Additionally, the Supreme Court has held § 1981 "encompasses a complaint of retaliation against a person who has complained about a violation of another person's contract-related 'right.'" *CBOCS W., Inc. v. Humphries*, 128 S. Ct. 1951, 1954 (2008). And under a closely analogous statute, 42 U.S.C. § 1982, the Supreme Court has held a white property owner could sue a corporation when it denied a membership share to a black man to whom the property owner rented his house. *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229 (1969). The Supreme Court has also made clear that § 1982 encompasses retaliation claims, *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 176 (2005), and that Supreme Court precedents "have long construed §§ 1981 and 1982 similarly" because they are "sister statutes," *CBOCS W.*, 128 S. Ct. at 1955–56.

Based on the foregoing precedents, the Court concludes Hogue may claim he was engaged in a protected activity in opposing Defendant's alleged treatment of Blake. The question then becomes whether Hogue has alleged sufficient evidence from which a jury could find Hogue engaged in a protected activity. Defendant argues a letter from Plaintiffs' counsel stating counsel's "belief that Mr. Blake was wrongfully accused and barred from FedEx Ground property" based on racial bias (Hogue Dep. Ex. 21) is a "conclusory statement" which cannot defeat summary judgment. *Barrett*, 556 F.3d at 519. Even if true, however, Defendant ignores numerous other statements from which a jury could conclude Defendant's supervisory personnel engaged in impermissible racial animus. Plaintiffs have introduced evidence from Hogue, Blake, and another employee that John

21

Certo, Defendant's Maintenance Manager, called Blake a "black motherf–king n----r," called him a "monkey," stated the social security and welfare systems were created for black people, and engaged in other conduct which Hogue and others alleged was motived by race. These comments by Certo are relevant because in Title VII cases (and, by extension, in § 1981 cases), discriminatory remarks made by a person who played a meaningful role in a personnel decision, even if he is not the ultimate decision-maker, are relevant evidence of discrimination. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354–55 (6th Cir. 1998). Plaintiffs' introduction of this evidence could persuade a jury that Hogue was opposing what he reasonably believed to be impermissible racial bias by Defendant's management, and therefore was engaged in a protected activity.

### ii.    Causal Connection

Defendant argues Plaintiffs cannot establish a causal connection because Hogue only found out he would not receive the contract for the new facility several months after complaining about Blake's treatment, and Plaintiffs present no other evidence which would permit an inference of causation. Plaintiffs respond by pointing to evidence concerning the timing of Hogue's complaint, and other evidence of how Hogue was treated, to demonstrate a causal connection.

"A causal link can be shown by either of two methods: (1) through direct evidence; or (2) through knowledge coupled with a closeness in time that creates an inference of causation . . . . However, temporal proximity alone will not support an inference of retaliatory discrimination when there is no other compelling evidence." *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000) (quoting *Parnell v. West*, No. 95-2131, 1997 WL 271751, at *2 (6th Cir. May 21, 1997)). While Sixth Circuit cases are divided on whether proximity alone is sufficient to show causation, *Hamilton v. Starcom Mediavest Group*, 522 F.3d 623, 629 & nn.1–3 (6th Cir. 2008), the cases do

22

indicate that "proximity alone generally will not suffice where the adverse action occurs more than a few months . . . after the protected conduct," *id.* at 629.

Here, Defendant takes issue with Plaintiffs' characterization of *Nguyen* as requiring both proximity in time and "totality of the circumstances under which the events occurred." While "totality of the circumstances" is not quite the precise language in *Nguyen*, it comes close to articulating that case's main point: the longer the period between the protected activity and the adverse action, the more additional evidence a plaintiff will have to show to convince the court of a causal connection between the two. The Sixth Circuit has found a causal connection without additional evidence where there was a 21-day period between the protected activity and the adverse action. *DiCarlo v. Potter*, 358 F.3d 408, 421–22 (6th Cir. 2004); *see also Muhammad v. Close*, 379 F.3d 413, 417–418 (6th Cir. 2004) (noting proximity may be "significant enough to constitute indirect evidence of a causal connection so as to create an inference of retaliatory motive"); *Hamilton*, 522 F.3d at 629 n.1 (citing similar cases). On the other hand, the Sixth Circuit has not found longer periods, without more evidence, to be sufficient for a causal connection. *See, e.g.*, *Cooper v. City of N. Olmstead*, 795 F.2d 1265, 1272 (6th Cir. 1986) ("The mere fact that Cooper was discharged four months after filing a discrimination claim is insufficient to support an interference [sic] of retaliation."); *see also Hamilton*, 522 F.3d at 629 & n.3 (citing similar cases).

In this case, Hogue alleged he complained to Kramer about Blake's treatment in January 2008 (Hogue Dep. 167–68); Hogue's counsel wrote a letter making essentially the same complaint on February 18, 2008 (*id.* Ex. 21); and Hogue was informed the Janitorial Services Agreement would expire by a letter dated May 23, 2008. By itself, this approximately three-month period might not be sufficient to establish a causal connection. However, Plaintiffs have presented additional

evidence from which a jury could establish a connection. As described above, Hogue testified he suddenly became subject to harassment by Kramer after he complained about Blake's treatment, Kramer removed SK's name from a list of providers on Defendant's facility's wall, and started to complain about the quality of Hogue's work even though Hogue had not received complaints in the past and others thought he did a "fantastic job." There is also the fact that Plaintiffs and Defendant had a history of verbally renewing their written agreements, and this practice ended only after Hogue's complaint in early 2008. Based on the sum of this evidence, a jury could find that, coupled with the three-month period between Hogue's complaint and the non-renewal of the contract, there was a causal connection between protected activity and the adverse action. Accordingly, Plaintiffs have introduced sufficient evidence to meet their burden of showing a prima facie case.

### b. Legitimate, Nondiscriminatory Reason

Defendant maintains it did not extend the 2007 Agreement to Plaintiffs because another provider, ServiceMax, submitted a bid that was four times lower than Plaintiffs'. The parties apparently concur that, by itself, this is a nondiscriminatory business reason for Defendant's failure to extend the 2007 Agreement with Plaintiffs. The question then becomes whether Plaintiffs have introduced evidence from which a jury could conclude Defendant's proffered reason was pretextual.

### c. Pretext

Plaintiffs argue the award of the 2008 contract to ServiceMax was pretextual because Defendant supplied conflicting evidence regarding the timing by which ServiceMax submitted its bid. Defendant responds that ServiceMax provided a lower bid, and that any confusion in timing resulted from the manner in which ServiceMax's word processing system functioned.

To demonstrate pretext, a plaintiff must show the employer's proffered reason "(1) has no

24

basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Grace v. USCAR*, 521 F.3d 655, 677 (6th Cir. 2008) (quoting *Wexler v. White's Fine Furniture*, 317 F.3d 564, 576 (6th Cir. 2003)). "In order to prove pretext, therefore, the plaintiff must introduce admissible evidence to show that the proffered reason was not the true reason for the employment decision and that [discriminatory] animus was the true motivation driving the employer's determination." *Id.* at 677–78 (internal citations, quotations, and emphasis omitted).

The pretext dispute in this case revolves around the document ServiceMax used to submit its bid to Defendant for janitorial services in 2008. At the top of the document, the bid bears a date of July 1, 2008. (Court File No. 54 Ex. 5.) If Plaintiffs' account is to be believed, this bid was submitted over a month after Defendant informed Plaintiffs it would not extend the 2007 Agreement (Hogue Aff. ¶ 23); hence, the reason Defendant provided for not extending the 2007 Agreement was not actually a motivating factor in its decision. However, Defendant provided deposition testimony from ServiceMax's president, Mark Robinson, indicating the word processing program he uses has a feature which automatically inserts the date on which a user calls up a saved document, rather than keeping the date on which the user created the document. (Robinson Dep. 22.) Defendant further contends the document was actually created on or about January 30, 2008, and attached to an e-mail sent from Robinson to Kramer on that date. (Court File No. 54 Ex. 5.) But Robinson's testimony is not "uncontroverted" regarding this matter, as Defendant argues, because Kramer testified he did not have reason to believe the bid "was not a July 1st, 2008 document" (Kramer Dep. 103) and further testified he did not have reason to believe the document was not presented to him on July 1, 2008 (*id.* at 105).

25

This dispute presents a classic credibility issue that is only susceptible of jury resolution. A reasonable jury could believe Robinson's account of his word processing program's automatic insertion feature and conclude ServiceMax sent its bid around January 30, 2008—almost four months before Plaintiffs were informed they would not receive an extension to the 2007 Agreement. On the other hand, the jury could refuse to credit Robinson's account and believe instead Kramer's testimony, drawing the conclusion the bid was, in fact, prepared on July 1, 2008. If the jury believed the latter, it could conclude Defendant's proffered reason for not extending Plaintiffs' services was pretextual.

Therefore, Plaintiffs have met their *McDonnell Douglas/Burdine* burden of providing evidence from which a reasonable finder of fact could conclude Defendant inappropriately retaliated against Plaintiffs. Accordingly, the Court will **DENY** summary judgment on Plaintiffs' retaliation claim.

### D. THRA Claim

Lastly, Defendant argues Plaintiffs cannot support a THRA claim because they have not shown any practice by Defendant that violated the THRA. Plaintiffs respond that, in violation of the THRA, Defendant's alleged discrimination against Blake compelled Hogue to end Blake's employment with SK.

The THRA section under which Plaintiffs made their complaint makes it illegal to "[a]id, abet, incite, compel or command a person to engage in any of the acts or practices declared discriminatory by this chapter." Tenn. Code Ann. § 4-21-301(2). This subsection is notably different from the preceding subsection, which makes it illegal to "[r]etaliate or discriminate in any manner against a person because such person has opposed a practice declared discriminatory by this

26

chapter." *Id.* § 4-21-301(1). Though the statute does not define what constitutes aiding and abetting, the Tennessee Supreme Court has adopted those terms' common law definitions to require that "the defendant knew that his companions' conduct constituted a breach of duty, and that he gave substantial assistance or encouragement to them in their acts." *Carr v. United Parcel Serv.*, 955 S.W.2d 832, 836 (Tenn. 1997), *overruled on other grounds by Parker v. Warren County Util. Dist.*, 2 S.W.3d 170 (Tenn. 1999).

Here, Plaintiffs' argument is that by barring Blake from the premises after conducting what Hogue alleges was a flawed and unfair investigation tainted by racial bias, Defendant aided and abetted, or compelled, Hogue to fire Blake. But Hogue did not discharge Blake because of his race; Hogue discharged Blake because he had no open positions for Blake to fill. (Hogue Aff. ¶ 19; Blake Dep. 17.) Unquestionably, firing someone based solely on discriminatory animus against that person's race is actionable under the THRA. *Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 674 & n.3 (6th Cir. 2008) (holding under Title VII, an employer may not "discharge any individual, or otherwise . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race," and noting analysis of a wrongful termination claim is the same under Title VII and the THRA). But that is not the case here. The only actor who did any firing was Hogue, who did not do so on the basis of Blake's race. Hogue might be able to maintain a claim under § 4-21-301(2) if Defendant had ordered him to fire Blake, but in this case, Defendant only barred Blake from returning to the premises. It did not require Hogue to fire Blake; that decision was a result of the business situation Hogue faced. *Cf. Phillips v. Interstate Hotels Corp. #L07*, 974 S.W.2d 680, 685 (Tenn. 1998) (concluding the defendant did not violate § 4-21-301(2) where the plaintiff was not "forced to

27

participate in the activities designed to deny minorities access").  Finally, to sustain his claim for aiding or abetting under *Carr*'s standard, Hogue would have to allege that Defendant substantially assisted or encouraged Hogue to discharge Blake.  While Hogue alleges discharging Blake was necessitated by Defendant's barring Blake from its premises, there is nothing in the record to indicate Defendant "assisted or encouraged" Hogue to do so; indeed, by that point, relations between Hogue and Defendant's management were becoming strained to the point that neither party was likely assisting or encouraging the other to do much of anything.

Accordingly, the Court will **GRANT** summary judgment on Plaintiffs' THRA claim.


**IV.     CONCLUSION**

For the foregoing reasons, the Court will **GRANT IN PART** and **DENY IN PART** Defendant's motion for summary judgment.

An Order shall enter.


**/s/**
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**

28